# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 25-2568

———————————————

Becky Joseph

*Plaintiff - Appellant*

v.

Thomas-Grace Construction Inc.

*Defendant - Appellee*

————————

Appeal from United States District Court
for the District of Minnesota

————————

Submitted: March 17, 2026
Filed: July 24, 2026

————————

Before SHEPHERD, ERICKSON, and GRASZ, Circuit Judges.

————————

SHEPHERD, Circuit Judge.

Becky Joseph sued Thomas-Grace Construction Inc. (TGC), her former employer, alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and Michigan's Elliott-Larsen Civil Rights Act. The

district court[1] granted summary judgment to TGC, and Joseph appeals. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

TGC is a Minnesota corporation that provides construction and installation services for clients. TGC hired Joseph as a Lead Installer in November 2022.[2] After completing her training, Joseph began work on a TGC project in Las Vegas, Nevada, in January 2023.

Joseph's supervisor at the Las Vegas site was Gary Raney. After one day on the job, on January 10th, Joseph emailed TGC superintendent Brent Palmer to complain that Raney "let [her] know he knows the best way" and was "prevent[ing] [her] from doing [her] part." Palmer responded that Raney's method had proved successful in the past, but asked Joseph to "continue to keep [him] posted" of any issues. Palmer then clarified that Joseph's role with Raney was only a "temp spot," and that "[w]hen [the] night shift starts on the 22nd, [she] w[ould] be working . . . overnights." Joseph responded later that day to thank Palmer for his understanding and to follow up that she "underst[oo]d [Raney]'s position."

However, the very next day, Joseph emailed Palmer and told him she wanted to resign. She stated that she felt she was "misled," blamed Raney for her reassignment to the night shift, and said that she "was disrespected." She then told Palmer that "[n]one of you have had the chance to know me and my work" and that she "d[idn't] want to waste [her] time with false promises[] and false hope." Neither of Joseph's emails on January 10th or the 11th mentioned sex discrimination.

---

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota, now deceased.

[2]While Joseph now alleges that her real role at TGC was as an "inventory specialist" rather than an installer, it is undisputed that the offer letter she signed referred to her position exclusively as "Lead Installer."

At this point, a TGC employee noted internally that "[i]t might just not be a good fit for [Joseph,]" and that "it was always the plan" to "train [Joseph] on both night and day [shifts] before sending her to her own job." Replying to Joseph's threat of resignation, Palmer told her that her move to night shifts was not retaliatory, but rather was part of her training. Joseph stated she felt relieved and withdrew her resignation.

The troubles did not stop there, however. Two days later, while Joseph was staying at lodging booked by TGC, TGC learned that Joseph screamed and disrespected hotel staff when complaining about a noisy neighbor. TGC created an incident report but did not discipline Joseph. A week later, on January 20th, Joseph again emailed Palmer to complain about Raney, claiming that he was condescending and had "old fashioned ideals when it comes to females and the work." Palmer responded that TGC "should be notified immediately if there ever was a questionable situation outside of the natural grumpy human condition" and that "[a]s always, [TGC] do[es] not condone improper behavior[]." Joseph responded days later that she owed Palmer and TGC an apology for her "misunderstandings with/about [Raney]," stating that

> I'm now beginning to see [Raney] as a kind man, maybe a little rough in approach when there is a lot going on. I disagree with some of his ways, but I am gaining a better understanding of why he does things in such a controlled manner. I feel embarrassed and ashamed at my reaction to [Raney]. I have a new respect for him and a new perspective. I am very sorry that I sent such an emotional email. I was wrong.

Joseph then began an assignment in Sparks, Nevada, on February 6th. On February 9th, she backed a forklift into a vehicle. Blake Hansen, Joseph's supervisor at the time, prepared an incident report, although it does not appear that she was reprimanded or otherwise disciplined.

On February 22nd, Joe Cikotte stepped in as Joseph's supervisor on the Sparks site. On Cikotte's first day as supervisor, Joseph emailed TGC to complain, stating that Cikotte "want[ed] everything his way" and asking "why shouldn't I do th[ings] my own way." She also argued that "I'm ahead at knowing what we have and what we need" and complained that "I feel they are demeaning, don't want my opinion, and don't respect my own way." Joseph also emailed Cikotte directly on the 22nd, telling him "I'm not going to be criticized or demeaned, because of your self proclaimed prick title. If you can't work with me as a team, we will have issues." Joseph copied other TGC employees on this email, and it was eventually sent to Matty Malloy, TGC's Director of Operations. The next day, Joseph texted Cikotte that she would not be at work because she was "not feeling well and not in the mood to be ostracized." When Cikotte emailed TGC that day to explain his side of the story, he acknowledged that he had said he was "known to be a prick at times" but otherwise had "no indication that there was a problem."

On February 23rd, Malloy emailed Donna Caywood, another TGC employee, saying "[w]e need to terminate [Joseph]" and noting that her complaints seemed like "BS." However, Malloy quickly decided thereafter that this "was not the right course of action," and she instead determined that she "needed to investigate and look into [Joseph's] complaints." Malloy then sent Joseph an email on the 24th informing her that TGC was opening a full investigation into her allegations, requesting her to provide, among other things, "[n]ames of any witnesses . . . who have had similar incidents," "witnesses [who] may have relevant information," and "any notes, physical evidence[,] or other documentation regarding the incident." The email also specified that formal interviews would take place the next week. In response to this request, Joseph sent Malloy an email stating that she was being "treat[ed] . . . like [she] didn't know anything" and was not being listened to. Aside from Cikotte, Joseph also complained about Hansen, who she claimed "wouldn't listen to any of [her] suggestions and always dismissed [her] ideas." Her email further stated that "[t]he men are always right in the eyes of the company . . . . [and] are treated as more valuable" and that she was "stand[ing] up to their discrimination." Joseph's email did not refer to any documentary evidence or other

-4-

victims of the alleged discrimination: it only referred to a coworker, Michael Brocksen, who she claimed knew about the mistreatment.

On March 2nd, Malloy interviewed Joseph, Brocksen, Hansen, and Cikotte pursuant to the investigation. According to TGC's internal report of the investigation, Brocksen observed that while "there were times [where Hansen] was grumpy due to coming off a long shift," Brocksen "did not recall any circumstances that [Hansen] directed this towards [Joseph] directly"; the report further noted that Brocksen "did not notice any sort of inappropriate behavior or attitude from [Hansen] on the morning [of February 22nd]." The report also did not have any comments by Brocksen about Cikotte's alleged misconduct. And in Joseph's own interview, she did not mention sex discrimination by anyone at TGC. Accordingly, the report indicated that Joseph's claims of misconduct against Hansen and Cikotte had "no substantiat[ing] evidence."

On March 6, 2023, TGC sent Joseph the results of its investigation, stating that "due to lack of substantiated evidence, [it] could not confirm" Joseph's allegations; the report also stated that the position at the Sparks, Nevada site was "not a good fit" for Joseph. TGC then offered Joseph a role at its worksite in Orange, Connecticut, which was the only other available jobsite at the time and had the same pay and benefits. Rather than accept the transfer, Joseph resigned. She then sued TGC six months later in the United States District Court for the Western District of Michigan, alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and Michigan's Elliott-Larsen Civil Rights Act. Her suit was eventually transferred to the District Court for the District of Minnesota under 28 U.S.C. § 1404(a).[3] TGC moved for summary judgment on all claims.

---

[3]Although this case originated in the Western District of Michigan, we apply the law of this circuit. See In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 97 F.3d 1050, 1055 (8th Cir. 1996) ("When analyzing questions of federal law, the transferee court should apply the law of the circuit in which it is located.").

The district court granted TGC's motion for summary judgment. Regarding Joseph's discrimination claims, the district court found that "TGC's internal communications do not mention sex discrimination or any understanding that Joseph was complaining about sex discrimination"; that "the record is devoid of evidence tying TGC's decisions to any form of discriminatory animus"; and that "there are no documents supporting Joseph's claim[s]." Similarly, regarding Joseph's retaliation claims, the district court found that "none of [her] complaints, even broadly construed, included allegations . . . [of] sex discrimination" and "[a]s such, her complaints . . . do not amount to protected activity." The district court accordingly granted TGC summary judgment on Joseph's claims. Joseph appeals.

## II.

"We review the grant of summary judgment *de novo*, affirming if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Jackson v. Buckman, 756 F.3d 1060, 1065 (8th Cir. 2014) (citations omitted). "[M]ere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Jones v. Wellpath, LLC, 77 F.4th 658, 663 (8th Cir. 2023) (citation omitted). Because "[c]laims under Michigan's Elliott-Larsen Civil Rights Act involve the same analysis as Title VII claims," we analyze them together here. Sutherland v. Mich. Dep't of Treasury, 344 F.3d 603, 614 n.4 (6th Cir. 2003).

## A.

We first turn to Joseph's contention that the district court erred in granting summary judgment on her state and federal sex discrimination claims. An employee's Title VII sex discrimination claim can survive summary judgment in "one of two ways." Tenge v. Phillips Mod. Ag Co., 446 F.3d 903, 907 (8th Cir. 2006). "First, the employee can produce direct evidence of discrimination that demonstrates 'a specific link between the alleged discriminatory animus and the challenged decision . . . .' Alternatively, an employee can use the McDonnell

Douglas burden-shifting framework to establish an inference of unlawful discrimination." Id. (citation omitted). "Under this framework, [a plaintiff] initially must establish a prima facie case, which consists of showing [s]he (1) is within the protected class, (2) was qualified to perform [her] job, (3) suffered an adverse employment action, and (4) has facts that give rise to an inference of sex discrimination." McGinnis v. Union Pac. R.R., 496 F.3d 868, 874 (8th Cir. 2007). "If a plaintiff can make out a prima facie case, the employer must then articulate a legitimate nondiscriminatory reason for its actions, and then it falls to the employee to demonstrate that the reason was simply a pretext for discrimination." Tenge, 446 F.3d at 910.

Here, Joseph does not provide any direct evidence of sex discrimination. While she frequently argues that her supervisors "discounted [her] because [she] was a female" and treated her differently because of her sex, she does not cite any evidence for this other than her own uncorroborated, conclusory deposition testimony. Thus, her "allegations, unsupported by specific facts or evidence beyond [her] own conclusions," do not constitute direct evidence of discrimination sufficient to survive a motion for summary judgment. Jones, 77 F.4th at 663 (citation omitted).

Joseph also fails to establish a prima facie case of sex discrimination under the McDonnell Douglas framework, as she does not provide any "facts that give rise to an inference of sex discrimination." McGinnis, 496 F.3d at 874. As the district court found, "the record is devoid of evidence tying TGC's decisions to any form of discriminatory animus," and "there are no documents supporting Joseph's claim that TGC was motivated by unlawful discrimination." This conclusion is amply supported by the record, given that Joseph's own supporting witness, Michael Brocksen, "did not notice any sort of inappropriate behavior or attitude from [Hansen]," nor did he report any inappropriate behavior by Cikotte; that Joseph's emails regarding Cikotte on the day he allegedly mistreated her did not mention sex discrimination; and that Joseph herself did not bring up sex discrimination in her interview with TGC during its investigation of her complaint.

Joseph does not cite any evidence to refute the district court's finding—only her own conclusory allegations about TGC. While she frequently refers to her deposition statements and her email to Malloy complaining that "[t]he men are always right in the eyes of the company . . . . [and] are treated as more valuable," these self-serving statements do not create a genuine factual dispute as to whether discrimination occurred. See Jones, 77 F.4th at 663; Palesch v. Mo. Comm'n on Hum. Rts., 233 F.3d 560, 570 (8th Cir. 2000) (holding that a plaintiff's "general allegations and opinion testimony [of sex discrimination did] not suffice" because "she failed to produce any evidence . . . other than her own unsubstantiated opinion testimony").

Joseph also contends that her first supervisor, Raney, discriminated against her based on sex as soon as she began working at TGC. But this contention is explicitly contradicted by her later communications to TGC regarding Raney, in which she admitted that she had "misunderstandings . . . about [him]," "fe[lt] embarrassed and ashamed at [her] reaction to [him]," and "was wrong."

Lastly, Joseph points out that she was "the only female" who was asked to transfer job sites and that neither Cikotte or Hansen were asked to transfer despite Joseph's allegations against them. To sustain a discrimination claim by showing disparate treatment, Joseph must show that she was "treated differently from similarly situated males" and "that [she] and male co-workers were 'involved in . . . similar conduct and [were] disciplined in different ways.'" Tenge, 446 F.3d at 910 (second alteration in original) (citation omitted). However, Joseph's disparate treatment argument fails out of the gate because she does not provide any explanation for how Cikotte and Hansen were "similarly situated" to her or how they were "involved in . . . similar conduct." Id. (citation omitted). Accordingly, because Joseph has not established a prima facie case of discrimination, the district court did not err in granting summary judgment on her discrimination claims.

B.

We next examine the district court's grant of summary judgment on Joseph's retaliation claims. In the absence of "'evidence, direct or circumstantial, showing a specific link between [Joseph] and any alleged retaliatory practices,' the same McDonnell Douglas framework applies." Gibson v. Concrete Equip. Co., Inc., 960 F.3d 1057, 1064 (8th Cir. 2020) (citation omitted). Thus, Joseph "must first establish a *prima facie* case that would permit a reasonable jury to find that (1) she engaged in protected conduct, (2) she suffered an adverse employment action, and (3) the adverse action was causally linked to the protected conduct." Id. If Joseph establishes a prima facie case, "the burden shifts to [TGC] to 'show a legitimate . . . reason for its actions.'" Id. (citation omitted). Then, "[i]f such a reason is proffered, the burden then returns to [Joseph] to 'present evidence that (1) creates a question of fact as to whether [TGC]'s reason was pretextual and (2) creates a reasonable inference that [TGC] acted in retaliation.'" Id. (citation omitted). "Proof of pretext 'requires more substantial evidence' than a *prima facie* case 'because . . . evidence of pretext . . . [and retaliation] is viewed in light of the employer's justification.'" Gibson v. Geithner, 776 F.3d 536, 540 (8th Cir. 2015) (second and third alterations in original) (citation omitted).

The district court granted summary judgment on the basis that Joseph had not engaged in protected activity. However, we need not reach this issue because "even if we assume [Joseph] has established a *prima facie* case of retaliation, [s]he has failed to establish pretext." Id. Here, TGC had numerous legitimate reasons to believe that it was appropriate to transfer Joseph. TGC was concerned that Joseph had frequently butted heads with her supervisors over how to complete her work, sometimes on her first day working under them; that she had a forklift accident within her first week of working at Sparks; and that she had disrespected and screamed at a hotel employee. See Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1109 (8th Cir. 1998) (noting that "Title VII . . . does not prohibit employment decisions based on . . . job performance . . . [or] personality conflicts"). Furthermore, Joseph's job required her to be able to travel for extended periods of time, and

Malloy testified that installers like Joseph "get moved around quite often" and that the jobsite in Orange was the only other job site with openings at the time. Thus, TGC had legitimate reasons to transfer Joseph. See id.

Joseph's primary evidence of pretext is Malloy's email on February 23rd, in which she discussed terminating Joseph and called her complaint "BS." But Joseph does not dispute that Malloy changed her mind shortly after this; that Malloy subsequently reached out to her to schedule an investigation; and that Joseph was able to share her views and present any supporting evidence and witnesses she had in support of her complaint.[4] Moreover, the record does not show that the email in question was responding to protected activity at all, given that it was reacting to Joseph's email to Cikotte on the 22nd, in which she did not mention sex or discrimination but merely complained about his leadership style. Cf. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (noting that courts evaluating Title VII claims should "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'" (citation omitted)). While Joseph emailed Malloy on the 24th saying that "[t]he men are always right in the eyes of the company," this postdates Malloy's email on the 23rd, and Joseph does not provide any evidence that Malloy responded negatively to this latter email. Accordingly, considering TGC's numerous legitimate reasons for transferring Joseph, see Gibson, 776 F.3d at 540, and absent any reasonable evidence of pretext, we hold that the district court did not err in granting summary judgment on Joseph's retaliation claims.

---

[4]Joseph now asserts that this investigation was a "sham," but does not identify any issues with the investigation nor how alleged bias affected it. She also claims that TGC assigned her "strikes" for submitting complaints, but this characterization came from her own counsel while deposing Malloy and is otherwise unsupported by the record.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

_____